DORE, Judge.
This is a suit for workmen’s compensation wherein the plaintiff alleges that on February 7, 1950 and for sometime prior thereto, he was employed by the defendant, Hillyer Deutsch Edwards, Inc., as a log cutter and that on said date while in the course and scope of his employment, engaged in cutting logs in Allen Parish, Louisiana, a big log accidently fell against him and bound him to a tree seriously injuring his back and right leg; that as a result of his accidental injuries he was forced to receive medical treatment and was hospitalized for some eight days with continued treatment some time subsequent thereto; that as a result of the accident the plaintiff sustained serious injuries to the bones, muscles, nerves, tendons, tissues and flesh of his back, particularly in the area of the low back, which causes him severe pain in the low back, right flank and right posterior thigh; that more specifically he has been examined and advised by a competent neurological surgeon that he is presently suffering from one or more ruptured intervertebral discs in the lumbar and sacral area of the back and that he is possibly suffering also from contusions .of the cauda equina; that as a result of the said injuries, he is totally and permanently disabled from performing the work in which' he was engaged at the time of the *460 accident or any work of the same or similar nature and that he is therefore entitled to recover workmen’s compensation at the rate of $29.20 (being 65% of his weekly’ wage) from his employer for a period not to exceed 400 weeks, less compensation'payments heretofore made, plus legal interest on delinquent instalments from due date, plus medical expenses in the sum of $500.00 with legal interest and for all costs. The petition further shows that plaintiff has employed counsel and prays that the attorney’s fee be fixed at 20% not to exceed $1000.00. The petition further shows that in order to try the case experts will be needed, and he prays that the fees of such experts be fixed and taxed as costs.
The defendant in its answer admits that plaintiff’s compensation rate is the sum of $29.20 and further admits that the alleged accident occurred. The defendant contends however, that the disability resulting from the accident terminated 28 weeks and 4 days subsequent to the accident and that the plaintiff was paid compensation at the proper rate of $29.20 during that period. In other words, the sole question to be decided in this case is whether or not plaintiff has remained with a disabling injury subsequent to the time that his compensation waá discontinued.
After trial of the case the District Court, without assigning any written reasons therefor, rendered judgment in favor of the plaintiff and against the defendant, awarding compensation for total permanent disability from February 7, 1950 for a period not to exceed 400 weeks at the rate of $29.20 per week subject to a credit of payments at the said rate during the period from February 7, 1950 to August 21, 1950, inclusive, together with 5% per annum interest on each unpaid weekly instalment of compensation from its due date until paid, plus costs including the fees of expert witnesses fixed in the judgment. The judgment also fixes the fee of plaintiff’s attorneys, as prayed for. The judgment is silent as to medical expenses.
From this judgment the defendant has appealed and earnestly urges that the judgment should be reversed on the ground that the plaintiff has failed to bear the burden imposed upon him of proving his case by a preponderance of evidence.
As stated hereinabove, the only question to be decided is whether or not the plaintiff remained with a residual disability subsequent to August 21, 1950, when his compensation was stopped.
The main contention of the defendant is that the preponderance of the medical testimony shows that plaintiff was entirely recovered by August 21, 1950, and that the accident in effect was of such a minor nature that he could not possibly have sustained the serious injuries claimed.
The testimony of the plaintiff is that he was engaged in sawing, with the help of another employee, with a power saw weighing 53 pounds, a log some 33 inches in diameter; that this log was sitting on a stump about 16 inches high or maybe higher; that it was higher on his side than on that of his fellow employee, implying that he was standing in a depression or else'his partner was standing on a hill; that as he cut the felled tree with the saw to make a 12 foot log, it rolled off the stump and swung toward him pinning him against a standing tree with the log pressing against him and the saw; that the log was pressing against his right thigh and also against his stomach; that he could do nothing but call for help and that he told the other employees there “You all cut the tree down. It is killing me”, meaning the tree against which he was pinned; that he states that thereupon in a few minutes they cut the tree down, and that when he got loose he sat on the ground for a while until the superintendent, a Mr. Kennedy, asked him about going to the doctor, He states “I told him to let me set there for a while. He asked me did I think anything was broke about me. I told him I didn’t think it was. -He let me set there for a while to see if I could get up and walk and see if I could cut up what timber I had on the ground with my partner handling the motor part of the saw.” He further states that after resting for thirty minutes, someone bathed his back and leg with some kind of oil or antiseptic and that he thereupon went back to *461 work and finished cutting the logs which he had on the ground, with some help; that he did not finish the day but worked around an hour and then went home; that the .next morning he was in such a condition that he could not even get up and that he accordingly notified his superintendent, Mr. Kennedy, and that Mr. Kennedy had him brought to the company doctor, Dr. Gray, who hospitalized him for some eight days and treated him with heat treatments .and “rest medicines” and continued to treat him for sometime thereafter.
The sum and substance of plaintiff’s testimony is that his injury was a crushing type to the abdomen and back. In opposition to plaintiff’s testimony, the defendant offered the testimony of 0. P. Kennedy and Herbie Fontenot, two employees of the defendant who together with plaintiff’s' working partner, Watts, witnessed the accident. They testified that the log on which the plaintiff was working had been felled and was but 3 or 3⅝ feet from the .ground; that it was not necessary for the plaintiff to have been holding the saw above his head as he had testified, because the log was about waist high and could be sawed by holding the saw at about that •position on plaintiff’s body.
These witnesses further testify that when ■the log was cut off, it rolled and caught the saw and pushed the plaintiff back .against a little sapling, 5 inches in diameter, and pinned his thigh and right buttocks against this tree; that no part of ■plaintiff’s spine came in contact with the ■sapling and that after he was released he ■examined his leg and continued to work from then until quitting time. .
The defendant strongly contends that the .above testimony uncontradicted by other eyewitnesses negatives the seriousness of the type of injury sustained by the plain■tiff. It may be noted here that there is no clear showing that plaintiff sustained -any abrasions or serious bruises in the accident, but the fact remains that he was pinned by a heavy rolling log against a standing tree and remained in that position for several minutes until the tree was cut down or bent down by his fellow employees. The fact remains also that thereafter he was hospitalized for some eight days; that he subsequently received medical attention for some time and was paid workmen’s compensation for some twenty-eight weeks and four days. ■ These facts indicate to us that the accident did result in a crushing injury.
In addition to his own testimony the plaintiff relies on the testimony of Dr. Edmund C. Campbell, Orthopedic Surgeon of Lake Charles, and Dr. John B. Sutton, Neuro-Surgeon of Shreveport, Louisiana, and on the testimony of five lay witnesses.
Dr. Campbell examined the plaintiff on two occasions. His first examination was in April, 1950, and he sums up. his findings at that time briefly as follows: “At that time I felt that the patient suffered some discomfort probably in the region of the right hip and thigh but I felt that no objective evidence on physical or x-ray examination substantiated the claim of disability at that time.” He further testified that “I did not feel at the time of the examination that the patient presented physical signs to lead me to make a diagnosis as to the cause of his pain. I did not believe that he was a malingerer at that time however.”
Dr. Campbell again examined the plaintiff on October 23, 1950 at which time he found that plaintiff had a one-fourth inch atrophy of his right calf and a diminished right Achilles reflex as compared with the left. He was of the opinion that these findings were suggestive of an intervertebral disc injury and that at the time the plaintiff was disabled to perform the duties of a log cutter. He sums up his findings as follows': “In combination with the history, the patient’s complaints and the physical findings, I feel that the diagnosis of inter-vertebral disc injury is the most likely and probable cause of the findings.”
Dr. John B. Sutton, the Neurological Surgeon, testifying by deposition, stated he too examined plaintiff on two occasions. On his first examination, on October 12, 1950, he diagnosed plaintiff’s condition as a ruptured intervertebral disc between the fifth lumbar vertebra and the sacrum, with possibly a second one in the next higher intervertebral space. He. is also of the *462 opinion that plaintiff was suffering from injuries to the cauda equina. He bases his diagnosis of a ruptured disc on the subjective symptoms of pain elicited from plaintiff and the history of the case as given him by plaintiff and on the findings of more than one-fourth inch atrophy of the right calf by measurement, paraspinal muscle spasm, and diminished “ankle and plantar jerks on the right side and also the plaintiff’s posture during the examination”.
On the second examination of the plaintiff by Dr. Sutton on December 21, 1950, he was even more convinced of his diagnosis, stating: “I believe he very likely had two herniated nucleus pulpusoses; one of the lumbosacral space, and possibly one of the next joint above, and probably has had a concussion or contusion of the cauda equina”.
Dr. Sutton further testified that as a test of plaintiff’s sincerity he asked plaintiff if he were willing to submit to surgery in order to get well and that plaintiff told him that he would.
The lay testimony introduced by plaintiff consisted of the testimony of five residents of the community of Florien, the former home of plaintiff, where it is shown that plaintiff visited frequently subsequent to his injury. These five white men, all substantial citizens, testified that they had known plaintiff, or colored man, practically all his life and that since his accident they had observed him on many occasions under circumstances where plaintiff was not aware of being observed and that from such observations they knew that he was crippled and unable to do manual labor. Some of these witnesses after being qualified, testified that this colored man’s reputation for truth and honesty was good.
The defendant relies entirely on the testimony of five physicians who treated and examined plaintiff on various occasions, together with the testimony of witnesses Kennedy and Fontenot, reviewed herein-above, as to the nature of the accident. The five physicians relied upon by defendant, are Dr. D. M. Kingsley, Orthopedic Surgeon of Alexandria, Louisiana, Dr. C. V. Hatchette, Orthopedic Surgeon of Lake Charles, La., Dr. F. J. Macpherson, Orthopedic Surgeon of Shreveport, La., Dr. Lloyd H. Murdock, General Practitioner of Zwolle, La., and Dr. L. F. Gray, the Company doctor, who first treated the plaintiff.
Dr. Gray testified that he first saw plaintiff on February 8, 1950; that plaintiff walked into his office and that he examined him and made a diagnosis of contusion of the muscles of his lower back, his hip and thigh; that he was admitted to the hospital and x-rays were made to determine if there was any bone injuries, and he was kept in bed for about four days and given physiotherapy and bed rest, and was given two to three doses of aspirin a day to relieve his pain; that he was discharged from the hospital after a period of about six days and thereafter came back for a period of fifteen to sixteen days for his physiotherapy; that he was then referred to Dr. Kingsley, Orthopedic Surgeon of Alexandria. Dr. Gray states that plaintiff “had no abrasions and he had no open lesions and most of his trouble was subj ective”.
Dr. Kingsley testified that he graduated from Rush Medical College of the University of Chicago in 1931 and thereafter was associated with medical schools or hospitals in teaching capacities or training capacities until the time of the war; that he was an army orthopedic surgeon and that he has been in private practice since 1947. He states that he saw plaintiff on two occasions, the first time on March 20, 1950 and the second time just a few days before the trial. He states that in his examination of March 20, 1950, he gave him the various orthopedic tests and spent an hour and a quarter examining plaintiff and then had x-rays made after which he examined the x-rays in plaintiff’s presence, and states:
“I told him I could find nothing seriously wrong with him, but since he has been off from work for a period of time it would be advisable to take a few days to do increasingly harder work and then return to his regular job.”
He testifies further as follows:
*463 “Q. Doctor, on the occasion of your first examination, in what respects did Maxie complain ? A. He stated that at the time of his injury he had been able to work for approximately an hour after he was freed from the position in which he was pinned, but the next morning he had sufficient pains in his back and lower part and in his right thigh to get him to consult Dr. Gray.
“He stated that the pains in his thigh had improved, but his back was still as painful as on the day of the accident. He made the statement to me that the leg had recovered to such extent that he would be willing to return to work if it were not for his back.
“At the time he saw me, he stated the low back area was painful when he was working in the morning and he was stiff. He had fewer pains when he started to move around but after, about an hour the pains in the low area became more severe. Then he had to sit down or lie down to get relief.”
Dr. Kingsley states that the second examination of the plaintiff was made on January 9, 1951, and that he again made the same detailed examination consuming an hour and a half. He states:
“I did the exact identical examination as before, but the findings were considerably different. For example, he insisted on the use of a cane which he held in his right hand, and had a lot of trouble getting him to do without it. I had him walk without it and he leaned on to the left side, but he had an extremely peculiar kind of walk. He said his right lower extremity hurt. But he had a limp, and in this limp the push or the long step came from the supposedly painful right lower leg. I couldn’t understand why he should push harder consistently with the leg that was hurting him so much that he couldn’t stand on it. I noticed him get on the table, and the left leg went up first and all of his weight stayed on the right leg, which was the last one up.
“I had him walk around the table because he said he could not walk across the room, and when he pivoted at the corner all of the weight went on to the right lower extremity, yet just before and just after, when I asked him to stand on either leg by itself, he almost crumpled when he tried to stand on the right. He insisted he could not put any weight on it, and there was a considerable discrepancy in what I found he could do and what he said he could do. * * * >1
It is his testimony based on the various tests that he made on plaintiff, that his symptoms were entirely subjective and, in effect, that plaintiff is a malingerer. He concluded that due to plaintiff’s long layoff he needed a reconditioning period and then could return to his regular occupation. He failed to find any difference in the Achilles reflex and the plantar reflex on the right from those on the left and also failed to find any atrophy of the right calf as found by Dr. Sutton.
Dr. Hatchette examined the plaintiff on August 17, 1950 and again on January 4, 1951. It may be noted that he has been practicing orthopedic surgery since 1940. In his report of his first examination of August 17, 1950, he gives the history as given to him by plaintiff of the accident of February 7, 1950. He states that the plaintiff did not appear to be in pain and that according to the history his low back was injured and that the injury to his back occurred when he was cutting the trunk of a tree which had previously been felled. He states further that there was no hypal-gesia in the lower extremities and that all of the reflexes were present and active. He makes the positive statement “It was my opinion at that time this patient was able to return to his normal work. I saw no evidence of disability whatsoever.” Dr. Hatchette’s examination included x-ray examination made by Dr. Stakely Hatchette, which showed no bone injury.
With reference to the second examination on January 4, 1951, he states: “On the examination of January 4, this patient came into my office with a very peculiar gait. This gait was principally due to some apparent interference with function of the right lower extremity. He did not bend the knee and stated that he could not do so. There was apparently some atrophy *464 of the right lower extremity below the knee. Examination showed this to he one quarter of an inch smaller in circumference than the calf on the left side.”
He further states that the reflexes were perfectly normal on the right lower extremity. He explains the atrophy of the right leg by the non-use of that extremity. He makes the statement: “I cannot say that this man was not suffering pain. Pain is a symptom. I felt, however, in view of the negative objective findings that his statements were exaggerated and that he could return to work because of the functional ability that he demonstrated to me.”
Dr. Murdock testified by deposition on behalf of the defendant to the effect that plaintiff came to him for medical treatment by reference from Dr. Gray on March 25, 1950 and that he treated him on several occasions thereafter; that in the meantime he was given an examination, by Dr. Macpherson of Shreveport, and that on April 20 he reported for a checkup and that the report of the orthopedic indicated malingering. The treatment of Dr. Murdock consisted of diathermy on sight of pain. He states that his impression was that the patient was a malingerer. It may be noted that Dr. Murdock is somewhat in doubt about the plaintiff since he is the one who referred him to Dr. Macpherson.
Dr. Macpherson examined plaintiff in April, 1950, and again on January 8, 1951. With reference to his first examination he gives the same history of the accident as the other doctors and makes the statement that it was pretty obvious during the course of the examination that the man was attempting very much to impress him as his examiner and concludes, “at the time of that examination, I could find no objective findings on this patient to support any orthopedic’s diagnosis of injury”. He further concludes that the patient was able to resume his accustomed duties of his former occupation.
Dr. Macpherson further testified by deposition that he re-examined plaintiff on January 8, 1951, and stated that at that time he found atrophy of the right calf measuring one quarter inch as compared to the left and further stated “that very definitely the right ankle jerk is present and if diminished, is diminished so slightly that I could not ascertain any difference.”
Dr. Macpherson makes this statement which would seem significant: “I would say that in this man’s examination the atrophy of his right calf cannot be completely disregarded unless it would be the result of disuse, which could be intentional on the part of the patient. The diminution of the plantar reflex on that side also suggests that there might be some nerve involvement.”
He further states that the only true symptom of a ruptured intervertebral disc that he found on his last examination was atrophy of the right calf.
Summarizing the medical testimony, it is apparent that it is very contradictory and that the two doctors who testified on behalf of the plaintiff are of the opinion that he is suffering from a real disability, to-wit, a ruptured intervertebral disc, or discs, and possibly a contusion of the carda equina, whereas the five physicians testifying on behalf of defendant are apparently of the opinion that the plaintiff is a malingerer. The fact remains that the large preponderance of the medical testimony, including the testimony of the defendant’s doctors, is that the plaintiff has atrophy of the right calf and diminution of the reflexes on the right, constituting a rather definite indication of an intervertebral disc injury. It may be noted, as brought out by counsel for plaintiff, that even Dr. Kingsley, who had failed to find any atrophy in his two examinations of plaintiff, admitted upon examining plaintiff at the trial that his right calf was one quarter inch smaller in circumference than the left. It seems to be the theory of the defense physicians that the atrophy of the right extremity and the diminution of the reflexes on the right were not caused by the accidental injury, but by wilful non-use of the right limb by the plaintiff. In other words, they seem to take it for granted that the plaintiff favored his right leg month after month for’ the express purpose of building up a compensation claim, and in doing so eve» *465 fooled five old reputable white citizens of his home community of Florien.
The defendant cites the case of Johnson v. Hillyer Deutsch Edwards, Inc., La.App., 185 So. 652, decided by this court, wherein greater weight was given to the testimony of older and more experienced doctors, setting forth that Dr. Hatchette and Dr. Kingsley especially were much more experienced than the doctors testifying on behalf of plaintiff. In that connection, it may be noted that Dr. Sutton was the only Neuro-Surgeon who testified in the case and that while his actual private practice has been brief, yet his training and hospital experience in his specialty has been very extensive and thorough. We are very much impressed by his testimony and we feel sure that the trial judge was also. As brought out in the case of Austin v. Industrial Lumber Co., La.App., 8 So.2d 727, 730, with reference to another young doctor “While Dr. Hargrove is a young doctor, yet he has been well prepared for his profession, and his testimony indicates to us that he is thoroughly familiar with that part of medical science which should enable a doctor to decide whether or not a man has a hernia”. In the case at bar, it is our opinion that Dr. Sutton has shown by his testimony that he is thoroughly qualified to make the diagnosis of a ruptured in-tervertebral disc or discs and contused car-da equina.
We feel that his testimony and that of Dr. Campbell is well corroborated by the five lay witnesses, and by the circumstances that in our opinion the accident resulted in a crushing injury. It may be noted that counsel for defendant criticizes plaintiff for failing to produce lay witnesses from Oakdale where he was residing, such as his wife and his relatives. We do not feel that this criticism is well founded, because the five witnesses produced were absolutely disinterested witnesses and had known the colored man many years prior to the accident. They certainly had much less reason to favor the plaintiff than his wife, relatives or close friends would have had. It may be noted further that the defendant did not see fit to produce any lay witnesses, if it could find one, who could testify that by his actions the plaintiff was faking.
In conclusion, while the trial judge did not favor us with written reasons for his judgment, it is obvious that the judgment is based on the conclusion of fact that he found the plaintiff to be totally and permanently disabled within the purview of the compensation act. He had the advantage over this court of personally observing the plaintiff as well as the other witnesses who testified at the trial on the witness stand. After a thorough review of the record, we can find no manifest error in the trial judge’s conclusion of fact and we therefore affirm the judgment appealed from.